IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. BROOKS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

PAUL D. BROOKS, APPELLANT.

Filed October 22, 2024.    No. A-23-730.

Appeal from the District Court for Furnas County: JAMES E. DOYLE IV, Judge. Affirmed.

F. Matthew Aerni, of Aerni Law, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial in the Furnas County District Court, Paul D. Brooks was convicted of one count of first degree sexual assault of a child and was sentenced to 25 to 35 years' imprisonment. On appeal, Brooks claims that there was not sufficient evidence to support his conviction, and that three witnesses should not have been allowed to testify about other sexual assaults he allegedly committed. He also claims that his trial counsel was ineffective. We affirm.

## II. BACKGROUND

### 1. CHARGE AND PRETRIAL MOTION

The criminal charge in this case stems from a sex trafficking investigation. In January 2020, C.G., age 16 at the time, informed law enforcement that William Quinn had trafficked her to numerous individuals in 2019. She provided a list of individuals to whom she had been trafficked, and Brooks' name was on that list.

- 1 -

In an information filed on November 24, 2020, and an amended information filed on March 21, 2023, Brooks was charged with one count of first degree sexual assault of a child, C.G., in violation of Neb. Rev. Stat. § 28-319.01 (Reissue 2016). According to the amended information, the charged offense was alleged to have occurred on or between September 21 and 30, 2019.

Prior to trial, the State filed a notice of intent to offer evidence at trial of other offenses of sexual assault committed by Brooks pursuant to Neb. Rev. Stat. § 27-414 (Reissue 2016), and the State requested a hearing to determine the admissibility of the same. The State claimed that S.N., J.S., and H.S., all currently adults, alleged that Brooks sexually assaulted them when they were younger. Following a hearing on the matter, the district court ordered that the State was permitted to adduce evidence of the prior sexual assaults, and S.N., J.S., and H.S., could testify at trial. However, the court's ruling on the admissibility of the prior sexual assault evidence was conditional, and the State could not present any evidence pursuant to § 27-414 from such witnesses at trial until after there had been evidence presented as to the alleged sexual assault described in the amended information.

## 2. Trial

A jury trial was held in June 2023. Evidence was presented through witness testimony and exhibits. Brooks did not testify in his own behalf. A summary of the evidence follows.

### (a) C.G.'s Testimony

C.G., born in October 2003, testified that in June 2019, she was living with one of her adult sisters in North Carolina. C.G. became Facebook friends with Quinn, and they began communicating through Facebook Messenger and then by phone. C.G. knew Quinn because one of her sisters worked for him at a cafe in Oxford, Nebraska. C.G. and Quinn discussed C.G. moving back to Nebraska, and he offered her a job at the cafe. She moved to Nebraska on July 1 and initially lived with another one of her sisters. However, when C.G. got to Nebraska, Quinn told her that the job was no longer available because he was selling the cafe.

Two of C.G.'s older brothers worked for Quinn, who also owned a construction company. C.G. began living with one of those brothers, but "[h]e had multiple people living with him that were offering [her] drugs," so she moved into a house owned by Quinn; she did not pay rent to Quinn. C.G. spent time with Quinn "pretty much" every day from 6 a.m. to 4 p.m. She would "ride around with him and help out" with his construction business by unloading construction tools, painting, and cleaning up the houses when a job was finished; Quinn did not pay her for her help.

"Within the first couple weeks" of C.G. moving to Nebraska, Quinn started introducing her to men that he knew. "[Quinn] would offer me to other men for sex, and . . . some of those men would pay and [Quinn] would take the money"; "[Quinn] said that was his payment for helping me move into the house, and providing food, and stuff like that." "Sometimes he would take me to meet them in person," but it was "more common for him to either give them or me their Snapchat or phone number."

C.G. said that Quinn drove her "[a]ll over" Furnas County, Nebraska, in his white Ford truck, and that whenever she got in his truck, he made her take off her clothes. If C.G. did not listen to him "then there were consequences"; "[h]e would hit me, choke me, slam me up against walls." "[W]henever he would see somebody that he knew he would drive up to them and tell them

- 2 -

to come over to the pickup, and he would have them touch me" on "my breasts, my vagina." When C.G. had a man's Snapchat or phone number, she would then send the man nude photos of herself (taken by Quinn) or ask the man when he was going to meet her for sex. Quinn arranged for C.G. to have sex with "[a]t least thirty" different men between July and December 2019, and she met with some of those men multiple times.

C.G. first met Brooks in mid-September 2019, when she was 15 years old. Quinn told her that they were going to see an old friend of his. When they got to Arapahoe, Nebraska, Quinn called Brooks over to his truck to meet C.G. She "vaguely remember[ed]" Quinn telling Brooks that she was "a teenager that he was taking care of." Quinn "always referred to me as his fun little toy, so he was talking about me in that manner to . . . Brooks." C.G. did not testify as to any sexual encounter with Brooks at that first in-person meeting.

C.G. and Brooks began communicating via Snapchat and phone. C.G. said, "[h]e would always message me and tell me that he wanted to have sex with me that night," "[a]nd it never worked out so he would pretty much message me every night the same thing." "Typically, I would just tell him, okay, and to let me know when." C.G. sent nude photos of herself to Brooks. C.G. said that Quinn also sent Brooks a video recording of a sexual encounter that C.G. had with another man.

Later, C.G., her brother, and Quinn were repainting the inside of a house in Arapahoe (the Arapahoe house). In the afternoon, C.G.'s brother left for lunch, and Quinn said that he saw Brooks drive by; Quinn then made a phone call. C.G. stated,

[A]bout five to ten minutes later, I looked out one of the bedroom windows and I seen [sic] a white truck parked in the yard. And then right after that, . . . Brooks came inside the house into the kitchen. And [Quinn called me into the kitchen and he] took off my clothes and started touching [my breasts and he "fingered me" in front of Brooks], and then [Quinn] said that he got the basement ready. And when I went down there, there was a blanket that was laid on the floor, and . . . Brooks started having sex with me.

Quinn was standing by a door and looking outside; "[h]e said he was going to watch and make sure that no one came." C.G. said, "[Brooks] touched my breasts a little bit, and then he laid me down on the blanket, pulled down his pants, and then inserted his penis in my vagina." Brooks "was having trouble maintaining an erection," so "he then stopped trying to insert his penis in me and fingered me." C.G. was in the basement with Brooks for "[m]aybe five minutes" before he left.

C.G. testified that the female homeowner showed up at the job site unannounced many times. However, C.G. did not recall seeing the homeowner the day that Brooks was at the house. C.G. never saw Brooks again after that day. Brooks did not pay C.G., and she did not believe that he paid Quinn. According to C.G., there were some men that Quinn did not make pay, and "[h]e said" that Brooks was one of those men.

After C.G. had sex with Brooks, he "wanted to meet up for sex and I told him no, and then he went and told [Quinn] that I said no, and I got beat because of it." C.G. continued to have conversations with Brooks on Snapchat "[b]ecause if I would have stopped, [Quinn] would have found out." She sent Brooks more nude pictures of herself and "he would just say that I looked nice, and sometimes he would say that he couldn't wait to have sex with me." C.G. said that Brooks

sent her two videos through Snapchat of him having sex with a woman she assumed was his wife; C.G. described the specific sexual position she saw in the video.

C.G. described the dress that she believed she was wearing on the day she had sex with Brooks at the Arapahoe house as "a red mini dress with black stripes on it." When asked how she remembered the dress, C.G. replied, "Well, Snapchat has a memory system that will show you memories from years ago, and that picture [of me in the dress] popped up on my memories, and it brought back a lot of flashbacks, I guess you could say, of . . . Brooks"; she believed the Snapchat memory was dated September 23, 2019. When asked if it was possible she could have been wearing a different dress the day she had sex with Brooks, C.G. replied, "It's possible," "I just -- When I look at that picture it brings back a lot of memories and that's what my mind associates it with." When asked if it was possible that she may have worn that dress to the Arapahoe house a day other than September 23, C.G. replied, "It's possible, yes." She acknowledged that it was difficult to remember specific dates and times of when sexual encounters occurred, and the clothing she might have been wearing, during the 6-month period of time with Quinn "[b]ecause there's just so many and it all happened in such a short amount of time that it just seems like a blur to me."

On cross-examination, C.G. was questioned about her deposition testimony and agreed that she had testified that she took a picture of herself (through Snapchat) in that specific dress while at the Arapahoe house. C.G. acknowledged that during her deposition she said that she only wore that dress to the Arapahoe house one time; "but as I sit here today, I cannot recall" "if I wore it more than once." C.G. later testified, "I am a [sic] 110 percent sure when I look at that dress it brings back horrible memories [of Brooks], but I am not 110 percent sure I was wearing that dress." C.G. confirmed that after her deposition, she had a meeting with an attorney for the State, and an investigator. C.G. was asked, "Now, isn't it also true that . . . someone at that meeting told you that this could not have happened on September 23rd, 2019, because Mr. Brooks was not in Arapahoe?" She replied, "I believe that was said."

(b) Testimony of Law Enforcement and Investigators

A sergeant with the Furnas County sheriff's office testified that in January 2020, C.G.'s brother-in-law reported information regarding sexual assaults and prostitution that had been happening in the county. The sergeant subsequently interviewed C.G. who "advised that . . . in the previous year of 2019, she was trafficked for sex" by Quinn, and she gave the sergeant "a list of individuals that she was trafficked to," including Brooks. C.G. was taken to the child advocacy center and interviewed further. Quinn was arrested, and an investigation ensued in conjunction with the Nebraska State Patrol and the Nebraska Attorney General's Office; over 100 people were interviewed, and numerous search warrants were executed.

In March 2020, the sergeant interviewed Brooks, who was born in 1959. The recorded interview was received into evidence as exhibit 25 and was played for the jury during trial. During the interview Brooks said that he had known Quinn all of Quinn's life. Brooks answered Quinn's construction questions and lent him tools at times. In October 2019, Quinn contacted Brooks about borrowing some PVC pipe; Quinn pulled into the driveway of Brooks' shop with a female passenger and told the female passenger to "'show him what you got'" and then she "dropped her drawers" and "got bare." Brooks said he told the female to pull her pants up; he did not know her

name or if she was "the female in question." Brooks never saw Quinn with that female again after that incident. Brooks denied being friends with that female on social media but said that Quinn "snapped him a few times" in "probably November," "maybe December," and "it was her stuff." When asked what that consisted of, Brooks responded, "Just [Quinn] stuff," and he "couldn't really recall exactly what they were"; he later said it was of a female "buck naked," but he did not know if it was the same female. Brooks was asked, "Do you want to tell me about a time you went over to a house in Arapahoe with Quinn . . . and Quinn was there?" Brooks said, "I don't know what you're talking about." The interviewer said, "We know that you went over to that house, that [Quinn] was in there with a female and he was kind of touching her," "and that you went down to the basement with her." Brooks stated, "I don't know what you're talking about. I have no recollection of what you're saying, absolutely none."

The sergeant testified that Snapchat records put Brooks "a few blocks away" from the Arapahoe house on September 27, 2019.

Christina Oliver, an investigator with the Nebraska Attorney General's office who primarily worked cybercrime cases involving cell phone and electronic evidence, testified that Snapchat does not always track a person's location; in order for geolocation to be triggered, the person had to be doing something on Snapchat. Additionally, the Snapchat geolocation information "gives an approximation" of the person's location. Oliver reviewed Snapchat account records for C.G. and Brooks, and the geolocation data from their saved memories showed that on September 27, 2019, C.G. was in Arapahoe at 2:39 p.m. and 7:04 p.m., and Brooks was in Arapahoe at 7:04 p.m.; their locations at 7:04 p.m. were "about a block away" from each other. (A crime analyst for the Nebraska State Patrol also testified at trial. The analyst created a demonstrative timeline for C.G. and Brooks from September 14 to 29, 2019, using information from bank records, cell phone records, and Snapchat; the Snapchat geolocation showed C.G. and Brooks less than 2 blocks away from each other at 7:04 p.m. on September 27.)

Oliver also testified that C.G. was listed as a contact in the Snapchat account database on Brooks' phone. In the Snapchat records for Brooks and C.G., both had a picture from September 14, 2019, saved in their accounts that showed C.G.'s "vaginal area exposed to the camera"; according to Oliver, if one person saves a picture it stays on both parties' Snapchat accounts. When asked if it was her understanding that chats, memories, or stories will delete off the system unless specifically saved by the user, the investigator responded, "That's correct."

Oliver examined the data extracted from Brooks' cell phone. Because C.G. made a statement that she had received videos from Brooks of him having intercourse with his wife, his phone was searched for related video files. Oliver found a video file on Brooks' phone that was created in April 2019 and showed him having intercourse with a woman; Oliver described the sexual position seen in the video, and her description matched the one described by C.G. during her testimony.

With respect to her examination of Brooks' cell phone, Oliver testified she was asked to "locate any images . . . of a white pickup" because "that's what [Brooks] was driving on a certain date, and that would be relevant to this crime." Before looking for any images, Oliver "ran vehicle registration information for . . . Brooks to see what type of vehicles were registered to his name," and those records revealed that a white pickup truck was registered to him in September 2019. Oliver said that exhibit 22 was "an image of the white pickup that [she] located [on Brooks' phone]

- 5 -

that had matched the description of the pickup that was registered to . . . Brooks." (Exhibit 22 is a picture of a white 4-door "F-150" pickup.)

Edward Sexton was an investigator with the Nebraska Attorney General's Office and predominantly focused on electronics. Sexton reviewed the cell phone records for C.G., Brooks, and Quinn. On September 14, 2019, video files were sent from C.G.'s phone to Brooks' phone, and text messages were sent from Brooks' phone to C.G.'s phone. That same day, a video was sent from Quinn's phone to Brooks' phone, and a phone call was made from Quinn's phone to Brooks' phone. On September 27, there were several text messages and calls between Brooks' phone and Quinn's phone, including several exchanges over a 20-minute period beginning around 2:30 p.m., a call from Quinn to Brooks around 6 p.m. and again a little over an hour later, and then several message exchanges beginning around 11 p.m. Sexton's record review did not include the content of the video files or text messages.

Anna Brewer is an investigator with the Nebraska Attorney General's Office who investigates sex trafficking. She testified that she first interviewed C.G. at an advocacy center in January 2020, and C.G. stated that Brooks had sex with her. As part of her investigation into the allegations, Brewer located the Arapahoe house based on the description given by C.G. Brewer spoke to the female homeowner. In May 2020 the female homeowner of the Arapahoe house identified Brooks from a photo lineup and said that she saw him at her house in September 2019.

### (c) Homeowners' Testimony

The female homeowner of the Arapahoe house testified that she hired Quinn to do some work on her newly purchased house, including a bathroom remodel and painting. The work started in early September 2019, and the homeowners moved into the home on September 30. During the project, the female homeowner stopped by the house "every day, if not, you know ninety percent of the days" because she took lunch to the crew. She or her husband would also stop by other times of the day. She saw Quinn, C.G. and her brother, and other workmen at the house. One day towards the end of September (she could not remember the exact date), the female homeowner saw Brooks sitting in his pickup talking to Quinn and they "seemed to be having a heated discussion." The vehicle in exhibit 22 "looks to me like the vehicle that [Brooks] was sitting in, in my yard."

The male homeowner of the Arapahoe house testified that he was at the house twice a day for the entire last week of September 2019. He saw C.G. at the house "three times for sure" and each time she was in Quinn's pickup. The male homeowner did not testify to ever seeing Brooks at the Arapahoe house.

### (d) Brooks' Testimony From Quinn's Trial

Brooks did not testify in his own defense at trial. However, Brooks' testimony from Quinn's trial was read into the record in this case. According to that testimony, Brooks has known Quinn all of Quinn's life. Brooks denied ever having sex with C.G. and said he had never been inside the Arapahoe house. He had been by the house but did not recall ever stopping there. Brooks denied having phone contact with C.G. When asked if he exchanged texts with C.G., Brooks replied, "It was with Mr. Quinn."

### (e) 27-414 Testimony

S.N., J.S., and H.S. all testified at trial that they were sexually assaulted by Brooks when they were children. Their testimony will be set forth more specifically later in our analysis.

### (f) Alibi Testimony

Matthew Miller has a Ph.D. in computer science and was formerly a professor at a university in their cybersecurity program. He was currently doing cybersecurity and software development for a company that does family history and genetics. He also consulted "periodically for different court proceedings." When asked if he examined cell phones and computers as part of his consulting work, Miller replied, "Yes, I have examined both cell phones and computers in the past." Miller testified that extraction data from Brooks' phone showed that he was in either northern Nebraska, or around Yankton, South Dakota, on September 23, 2019. Miller did not look at data from any other date.

Ann Brooks is Brooks' wife. She testified that on September 27, 2019, she was with Brooks all day. They were in Kearney, Nebraska, and McCook, Nebraska, earlier in the day. Then in the afternoon they watched Ann's grandchildren in Arapahoe while her son and daughter-in-law had a date night; it was dark when Ann and Brooks left her son's house. On cross-examination, Ann was told that phone records showed she was texting her husband at 7:04 p.m. Ann responded that it was "possible" that Brooks was mowing at their house. But she then said they were at her son's house in the evening and that she and Brooks text each other even when in the same home.

Ann also testified that exhibit 71 is a picture of their pickup. (Exhibit 71 is a picture of a white 2-door Ford F-150.) She said that Brooks has never owned a white 4-door F-150.

### 3. VERDICT AND SENTENCING

The jury found Brooks guilty of first degree sexual assault of a child. The district court subsequently sentenced Brooks to 25 to 35 years' imprisonment.

Brooks appeals.

## III. ASSIGNMENTS OF ERROR

Brooks assigns, consolidated and restated, that (1) the evidence was not sufficient to convict him, (2) the district court abused its discretion when it allowed S.N., J.S., and H.S. to testify at trial pursuant to § 27-414, and (3) his trial counsel was ineffective in various ways. We set forth the assigned errors of ineffective assistance of trial counsel more specifically later in our analysis.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Id.* Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.*

Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law. *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Brooks contends that there was insufficient evidence to convict him.

As relevant here, a person commits sexual assault of a child in the first degree when he or she subjects another person who is at least 12 years of age but less than 16 years of age to sexual penetration and the actor is 25 years of age or older. § 28-319.01(1)(b). Pursuant to Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2022),

> Sexual penetration means sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement purposes. Sexual penetration shall not require emission of semen[.]

Brooks claims that C.G. testified that she had sex with him on September 23, 2019, "[a]nd she knows it was on September 23, because a photo of her wearing the dress appeared on her Snapchat Memories, which let her know the photo was taken on September 23." Brief for appellant at 49. He acknowledged that C.G. testified it was possible that she could have worn the dress to the Arapahoe house another day. Brooks also points out that C.G. testified that she had sex with him "around the lunch time," but that other witnesses testified that based on Snapchat geolocation data, Brooks and C.G. "were within a few blocks of each other in Arapahoe, but on September 27, 2019, (not on September 23, 2019), and not until approximately 7:00 PM (not around lunchtime)." *Id.* at 50. Additionally, he argues that "Arapahoe is not large. Everyone in Arapahoe at 7:00 PM on September 27, 2019, was within a few blocks of C.G." *Id.* Brooks' arguments go to the weight of the evidence and the credibility of the witnesses. See *State v. Lierman, supra* (appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, or reweigh evidence; such matters are for finder of fact).

Viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support Brooks' conviction. At trial, C.G. testified that in September 2019, she and Quinn were working on a house in Arapahoe. According to C.G., Quinn said that he saw Brooks drive by, and then Quinn then made a phone call. Five to 10 minutes later, Brooks entered the home. After being undressed, touched on the breasts, and "fingered" by Quinn, C.G. and

Brooks went to the basement where Brooks "touched [her] breasts a little bit" and he "then inserted his penis [into her] vagina." Brooks had "trouble maintaining an erection," so he then "fingered" C.G. Brooks' penetration of C.G.'s vagina--either with his penis or his fingers--meets the definition of sexual penetration for purposes of § 28-319.01. And the evidence established that C.G. was 15 years old and Brooks was 60 years old at the time the sexual penetration occurred. When viewed in the light most favorable to the prosecution, this evidence is sufficient such that a rational fact finder could have found the essential elements of the crime of first degree sexual assault of a child beyond a reasonable doubt.

2. ADMISSIBILITY OF EVIDENCE PURSUANT TO § 27-414

Brooks assigns numerous errors related to the admissibility of the testimony of S.N., J.S., and H.S. regarding prior sexual assaults he allegedly committed against them.

(a) General Principles of Law

Section 27-414 provides:

(1) In a criminal case in which the accused is accused of an offense of sexual assault, evidence of the accused's commission of another offense or offenses of sexual assault is admissible if there is clear and convincing evidence otherwise admissible under the Nebraska Evidence Rules that the accused committed the other offense or offenses. If admissible, such evidence may be considered for its bearing on any matter to which it is relevant.

. . . .

(3) Before admitting evidence of the accused's commission of another offense or offenses of sexual assault under this section, the court shall conduct a hearing outside the presence of any jury. At the hearing, the rules of evidence shall apply and the court shall apply a section 27-403 balancing and admit the evidence unless the risk of prejudice substantially outweighs the probative value of the evidence. In assessing the balancing, the court may consider any relevant factor such as (a) the probability that the other offense occurred, (b) the proximity in time and intervening circumstances of the other offenses, and (c) the similarity of the other acts to the crime charged.

(4) This section shall not be construed to limit the admission or consideration of evidence under any other section of the Nebraska Evidence Rules.

Section 27-414 allows evidence of prior offenses of sexual assault to prove propensity. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013).

(b) Hearing Pursuant to § 27-414

Prior to trial, the State filed a notice of intent to offer evidence at trial of other offenses of sexual assault committed by Brooks pursuant to § 27-414, and the State requested a hearing to determine the admissibility of the same. The State asserted that S.N., J.S., and H.S., all currently adults, alleged that Brooks sexually assaulted them when they were younger.

At a hearing on the matter, C.G.'s deposition was received into evidence by stipulation of the parties. (In her deposition, C.G. stated that she was born in October 2003. She also stated that

Brooks penetrated her vagina with his penis and his fingers at the Arapahoe house in September 2019.) S.N., J.S., and H.S. then testified as follows.

### (i) S.N.'s Testimony

S.N., born in 1978, testified that when she was "[e]ight, nine, ten," years old, she lived in the same town as Brooks, who was married to her aunt at the time. On one occasion S.N. spent the night at her aunt and Brooks' home. S.N. said, "I fell asleep on the couch that night" and "I woke up to him touching me"; "He put his fingers in my vagina." She was approximately 8 or 9 years old at the time. (On cross-examination S.N. said she thought it happened when she "was like nine," in "'87, '88.'") When her mother picked her up in the morning, S.N. told her what had happened, but S.N. did not think the incident was ever reported to law enforcement. After the incident, S.N. went to live with her father in another town and did not see Brooks again, at least not when she was a child. When asked what grade she was in when she went to live with her father, S.N. replied, "Fourth grade"; as for what year that was, it would have been "like '88."

### (ii) J.S.' Testimony

J.S., born in 1987, testified that when she was 8 or 9 years old, her mother married Brooks. For a while, J.S. preferred to live with her mother and Brooks because they did "a lot of fun stuff," and J.S.' father was often gone for work. However, J.S. said her relationship with Brooks "went from a regular relationship" "to just some uncomfortable situations." "There was the first time where I was rubbing his back and he was on the floor, and he felt up [the inner part of] my leg"; "[i]t started at my calf, and he worked his way all the way up to the crotch of my jeans." There were other instances of "[h]ugs, kisses [on the mouth], butt grabs, breast grabs." And "[t]here was one instance in particular when we were on the river," when Brooks and a friend "thought it would be funny to pull the top of my swimsuit down."

J.S. said that her mother and Brooks often drank alcohol, and they used cocaine. Both her mother and Brooks gave her alcohol. J.S. described another incident with Brooks:

> The last time we were drinking with my mom, and [Brooks], myself, and a friend of theirs, and I drank to the point where I laid on the couch and I couldn't quite function. I remember being helped down the stairs to my room which is where it was located. And I remember [Brooks] helping me to my room, helping me get undressed, leaning over, and biting my breast, and that's where I'm just done after that.

J.S. "remember[ed] being on [her] cycle at the time," "I woke up without a tampon, I went to bed with one." When asked if her vagina was sore when she woke up, J.S. replied, "Yes, everything was." She was "older" when that incident happened, "fourteen or fifteen" years old. J.S. did not tell her mother what happened because her mother "didn't care about anything," "[s]he only cared about doing what [Brooks] wanted to do and getting high." "Right after that, I was back with my dad," and "I moved in with my grandma." J.S. did not recall ever speaking to Brooks again.

J.S. told her father about the last incident with Brooks. "I thought my dad called it in, I don't know all of the details on how anything happened because it didn't go anywhere"; "I talked to an officer" and "I went to [an advocacy center] and that's as far as it went."

*(iii) H.S.' Testimony*

H.S., born in 1991, is J.S.' younger sister. H.S. testified that Brooks was her stepfather when she was in elementary school. H.S. was "eight, nine, maybe even ten" years old. When H.S. first met Brooks, "[h]e was great" and they "did all kinds of fun stuff." But then when H.S. was in "[m]aybe fourth grade," things started happening that made her uncomfortable. "[H]e would make us kiss him on the lips" and "the hugs were different than just normal hugs"; "[h]e just held you different" and "would have one [hand] on my upper back and one lower on my back." "And then we'd have to sit on his lap . . . it was directly on both of his legs . . . our backs would be up against his stomach."

H.S. described an incident when "[e]verybody in the house was drinking," including her sister and mother, Brooks, and Brooks' two daughters. H.S. said, "[w]e got . . . drunk" and "I remember stumbling around and [Brooks] helped me downstairs to help me go to bed," "[h]e helped me change into my pajamas and put me to bed." "I remember his crawling in bed next to me, and he started rubbing the side of my body, I was on my side, with his hand just rubbing up and down my arms, and then up and down my torso, and down my hip."

Q [by the State]. Was he rubbing you on top of your clothing or underneath your clothing?

A [H.S.]. Some was on top. And then -- When he would rub down it was on top, when he would rub up, he would pull my shirt up with his fingers to rub bare skin.

. . . .

Q. Did he ever touch any other parts of your body on that occasion?

A. Yes.

Q. What else did he touch?

A. My vagina.

Q. Underneath your clothing or on top of your clothing?

A. On top at first and then underneath.

Q. What did he touch your vagina with?

A. I don't know. I just remember pressure and closing my eyes and squeezing them and hoping that it would just stop.

. . . .

Q. Did he say anything to you?

A. Not during that time. When I started to cry, he said it's what dads and daughters do. It means if I love you and you love me, this is what we do.

H.S. said that her mother walked into the room when Brooks was "rubbing [her] torso and down [her] hip," but her mother "closed the door and left." This incident occurred when H.S. was still in elementary school.

H.S. was asked if there were other times that something similar happened to her; she said, "Yes." When asked to describe another incident, H.S. responded,

Another one is -- it wasn't the last time, but it was the last worst time, I guess. [Brooks] came downstairs and I used to try and prevent him or make it to where I could wake up if he was to come into my room. There was once I left a candle burning all night long on a

plate on the shelf that's right inside my door hoping that he would think that I was awake so he wouldn't come in. And there was wax melted all over my shelf, all over the carpet, everywhere.

There was another time I put net Christmas lights, and I overlapped the edges to where I knew how the Christmas lights ended and where I could walk through to get to my bed but hopefully nobody else would, and he still got to my bed. He came in, took off his pants, and laid on top of me. And [my mother] came in again, and she just said, "hurry up" and then she left.

H.S. said that when Brooks was laying on top of her, "[h]e was kissing me, and he removed my underwear. And then I felt more pressure [on my vagina], and I started to cry." Something was inside of H.S.' vagina, but she did not know what it was. Brooks was moving up and down, "[l]ike he was having sex."

H.S. testified that over the course of her relationship with Brooks, he vaginally penetrated her "[a]t least four" times and had her touch his penis a "minimum" of five times. She was in approximately third or fourth grade at that time.

After H.S.' mother and Brooks were divorced, Brooks had lunch with H.S. at school twice, and she went to his new house once. H.S. went to Brooks' new house and met his current wife and some of his new stepchildren. H.S. could not remember if Brooks picked her up, or if her grandmother took her to Brooks' house. H.S. said that she rode dirt bikes with Brooks and another person.

And after we were done riding dirt bikes, on the way home [Brooks] dropped [the other person] and the dirt bikes off and went to take me back to my grandma's house, and he pulled over on the side of the highway and put his hand up my shirt. And I looked away trying to avoid it or make him feel like it was unwanted and so he would stop. And he asked me if I still loved him, and if I did, why I wouldn't just let him. And when I turned around, he started to kiss me. And then he got upset when I wasn't returning the kiss. I just sat there. And he said, "Fine, I'll just take you home then." And he took me to my grandma's house.

H.S. was in sixth grade when that incident occurred, and she did not have any further contact with Brooks after that incident.

H.S. did not tell anyone what Brooks had done to her at the time because "[m]y sister told somebody, and nothing happened"; "[w]ho is going to believe a little sister after they just heard her big sister say it?"

### (iv) District Court's Ruling

In its order, the district court found that the State established, by clear and convincing evidence, that Brooks (1) was at least 19 years old at the time of the alleged events, and (2) sexually assaulted S.N., J.S., and H.S. as defined by Neb. Rev. Stat. §§ 28-319.01 and 28-320.01 (Reissue 2016). The court then conducted a balancing test as required by § 27-414(3). In doing so, pursuant to § 27-414(3)(a), the court considered the "[p]robability that the other offenses occurred," and found the "evidence adduced by the [State] was, as previously stated, clear and convincing that

Brooks sexually assaulted the three persons when they were children"; "[t]his factor weighs in favor of admission of the sexual assault." Pursuant to § 27-414(3)(b), the court considered the "[p]roximity in time and intervening circumstances." The court noted there was a large gap in time between the earliest prior offense and the current offense. However, "[a]fter considering the pattern of the assaults, the similarities in the facts, and ages of the assault victims, the remoteness in time does not weigh against credibility." Pursuant to § 27-414(3)(c), the court considered the "[s]imilarity of other acts to crime charged," and found:

> The acts of sexual assault against the three named persons are similar to the crime charged against Brooks, i.e., sexual penetration of a child less than 16 years of age. While some of the acts of sexual assault of the other children occurred when the children were younger than the age of the child in the instant case, the fact remains all the acts were committed on children less than 16 years of age.
>
> The acts are similar, and this factor weighs in favor of admissibility.

The court concluded that "[a]fter weighing and balancing the required factors, the risk of prejudice does not substantially outweigh the probative value of the evidence of the prior sexual assaults committed by Brooks on S.N., J.S.[], and H.S.," therefore all three "shall be allowed to testify at trial as to the prior sexual assaults committed on them by Brooks."

However, the district court said that its ruling on the admissibility of the prior sexual assault evidence was conditional; that "[w]hile the specific facts relating to the alleged sexual assault of the alleged victim in this case are before the court via the child's deposition," the State could not present any evidence pursuant to § 27-414 from S.N., J.S., and H.S. at trial until after it presented evidence from the child in this case regarding the alleged sexual acts described in the amended information.

### (c) § 27-414 Testimony at Trial

After C.G. testified at trial, the State requested to call H.S., "one of the witnesses that we called at the 27-414 hearing previously in this case, and we would ask her testimony be allowed under 27-414 for propensity evidence." Brooks' counsel objected, but his objection was overruled. The district court stated, "There has been established the necessary prerequisites for the introduction of the evidence under 27-414. And so we will proceed with the admission of the evidence from those three witnesses." The court asked the State to identify "for the record," the names of the witnesses that it would be relying upon, and the State named S.N., J.S., and H.S. The State also proposed that the court give the jury a "limiting instruction" "almost identical to the final instruction," at this point so that the jury would know "the proper purposes for which they can review this evidence." Brooks' counsel objected "to the instruction right now" because it was "sufficient" that it would be in the final jury instructions. The court said it would "certainly include an instruction at the end of the case," but was "not going to do anything now."

S.N., J.S., and H.S. then gave testimony at trial similar to the testimony they gave at the hearing prior to trial.

In its final instructions to the jury at the end of the trial, the district court stated:

> Instruction No. 9. You have heard evidence that . . . Brooks may have committed other acts of sexual assault. You may not convict . . . Brooks solely because you believe he

committed other sexual assaults. . . . Brooks is on trial only for the crime alleged in this case. You may consider the evidence of other acts of sexual assault on any matter for which they are relevant.

### (d) District Court Did Not Abuse Its Discretion

Brooks assigns, consolidated and restated, that (1) the district court abused its discretion (a) in finding that the State proved Brooks sexually assaulted S.N., J.S., and H.S. and (b) in finding that Brooks' prior conduct towards them was sufficiently similar to the crime charged in the instant matter; (2) the trial court abused its discretion in overruling his objection to J.S and H.S. testifying under § 27-414; and (3) "to the extent [Brooks] forfeited the errors discussed above, the errors were also plain error." Brief for appellant at 7. All of Brooks' assignments relate to the admissibility of the testimony of S.N., J.S., and H.S. at trial regarding prior sexual assaults he committed against them.

### (i) Proof Brooks Sexually Assaulted S.N., J.S., and H.S.

Pursuant to § 27-414(1), evidence of other offenses of sexual assault committed by the accused is admissible if proved by clear and convincing evidence. Brooks argues that the district court abused its discretion in finding that the State proved that he sexually assaulted S.N., J.S., and H.S. He specifically takes issue with the sufficiency of the evidence regarding the ages of the victims at the time of the various incidents they described, and whether each individual incident they described constituted sexual penetration or sexual contact.

The State argues, "Each incident-where Brooks either penetrated or had sexual contact with the victim-constituted sexual assault." Brief for appellee at 14. See, § 28-318 (definitions, including "sexual contact" and "sexual penetration"); Neb. Rev. Stat. § 28-319 (Reissue 2016) (first degree sexual assault); § 28-319.01 (first degree sexual assault of a child); Neb. Rev. Stat. § 28-320 (Reissue 2016) (sexual assault in the second or third degree); Neb. Rev. Stat. § 28-320.01 (Reissue 2016) (sexual assault of a child in the second or third degree). "S.N. and H.S. testified directly that Brooks sexually assaulted them," and "J.S. testified circumstantially that Brooks had assaulted her." Brief for appellee at 14.

The exact age of each victim at the time each specific incident occurred does not matter. S.N. testified that Brooks put his fingers in her vagina when she was between 8 and 10 years old. J.S. testified that when she was 14 or 15 years old, Brooks helped her to her room after she had been drinking and she "couldn't quite function"; she remembered that Brooks helped her get undressed, leaned over, and bit her breast, and then the next morning she woke up without her tampon and her vagina was sore. H.S. testified that when she was in elementary school, Brooks helped her change into her pajamas and put her to bed when she was drunk; Brooks got into bed with H.S. and he touched her vagina. H.S. also testified that Brooks vaginally penetrated her "[a]t least 4 times" and had her touch his penis a "minimum" of five times when she was in approximately third or fourth grade. We conclude that the district court did not abuse its discretion in finding that the State proved by clear and convincing evidence that Brooks sexually assaulted S.N., J.S., and H.S.

### (ii) Prior Conduct Sufficiently Similar

Brooks next claims that "assuming, *arguendo*, the evidence proved by clear and convincing evidence the prior assaults occurred," then the "trial court did not properly conduct the balancing test" pursuant to § 27-414(3) because it failed to do "a 'qualitative analysis' of the similarities and differences between the prior offenses and the offense charged in the instant matter." Brief for appellant at 39 (emphasis in original). "In the instant matter, the trial court's order found a single similarity between the charged crime and the other offenses, to wit: all accusers were under age 16 when the alleged offenses occurred." *Id.* at 40. And Brooks "[could not] find any cases where only a single similarity between the alleged prior offenses and the offenses for which the defendant was convicted was addressed." *Id.*

Initially we note that with regard to the balancing test, Brooks does not challenge the district court's findings and considerations regarding the probability that the other offenses occurred, or the proximity in time and other intervening circumstances of the other offenses. Brooks only challenges the court's consideration of the similarity of the other acts to the crime charged, and we limit our analysis accordingly.

In this case, the district court found that "[t]he acts of sexual assault against [S.N., J.S., and H.S.] are similar to the crime charged against Brooks, i.e., sexual penetration of a child less than 16 years of age." The court acknowledged that "[w]hile some acts of sexual assault of the other children occurred when the children were younger than the age of the child in the instant case, the fact remains all the acts were committed on children less than 16 years of age." Finding that the acts were similar, the court found that factor weighed in favor of admissibility. We find no abuse of discretion by the district court in this regard.

There was clear and convincing evidence that Brooks sexually assaulted S.N., J.S., and H.S., including by vaginal penetration, when they were minor females. That conduct was sufficiently similar to the crime Brooks was charged with in the instant case. See *State v. Stephens*, 26 Neb. App. 1, 915 N.W.2d 828 (2018) (similarity involved intent to vaginally penetrate a minor female).

### (iii) § 27-414 Evidence Properly Admitted

Under § 27-414, assuming that notice and hearing requirements are met and the evidence survives a more-probative-than-prejudicial balancing test, evidence of prior sexual assaults is admissible if proved by clear and convincing evidence. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

Here, the notice and hearing requirements were met. There was clear and convincing evidence that Brooks sexually assaulted S.N., J.S., and H.S. And the district court did not abuse its discretion in finding that that the evidence of the prior sexual assaults was more probative than prejudicial. Accordingly, we find that the testimony of S.N., J.S., and H.S. was properly admitted at trial.

### 3. INEFFECTIVE ASSISTANCE OF COUNSEL

Brooks' appellate counsel is different from his trial counsel. Brooks assigns that his trial counsel was ineffective (1) with regard to the § 27-414 evidence; (2) "for failing to object to a mischarac[t]erization of [Brooks'] prior testimony and request the court admonish the jury about

the mischaracterization"; and (3) "for failing to object to exhibit 22, and for failing to call the owner of the vehicle in exhibit 22 to testify." Brief for appellant at 7-8.

(a) General Principles of Law

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023).

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id.* When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id.* In *State v. Mrza*, 302 Neb. 931, 935, 926 N.W.2d 79, 86 (2019), the Nebraska Supreme Court stated, "We now hold that assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity."

Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *State v. Dap, supra.* The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.*

To prevail on a claim of ineffective assistance of counsel, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Collins*, 307 Neb. 581, 950 N.W.2d 89 (2020). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

With these standards and general principles in place, we turn to the claims alleged by Brooks.

(b) § 27-414 Evidence

Brooks claims that his trial counsel was ineffective for not objecting at trial to J.S.' testimony "about the breast biting incident" and H.S.' testimony "about the dirt bike track incident." Brief for appellant at 44. Brooks argues, "Clearly, the trial court did not believe [either] incident was admissible under § 27-414." *Id.* at 45. However, Brooks' claims about the trial court's belief is not supported by the record as no such finding was made in the court's order. Moreover, we have already found that the testimony of S.N., J.S., and H.S., was properly admitted at trial.

Accordingly, we need not further address any claims of ineffective assistance of trial counsel with regard to such evidence because Brooks would not be able to show prejudice given the other evidence provided by these witnesses.

### (c) Mischaracterization of Brooks' Prior Testimony

Brooks claims that his trial counsel was ineffective "for failing to object to a mischarac[t]erization of [Brooks'] prior testimony and request the court admonish the jury about the mischaracterization." Brief for appellant at 7.

Brooks did not testify in his own behalf in the current case. However, the State offered exhibit 24 into evidence. The State said:

> By way of explanation, Exhibit 24 is a transcript of proceedings in which . . . Brooks, the Defendant in this matter, was called as a witness on behalf of Defendant, . . . Quinn. We are going to read that testimony into the record. I don't believe this exhibit appropriately goes back to the jury, so the words that are actually spoken by Mr. Brooks will be spoken by Investigator Ed Sexton on the witness stand, and I will be reading either the Court or the questions posed by the lawyers.

Exhibit 24 shows that Brooks' testimony at Quinn's trial was as follows:

> Q [by Quinn's defense counsel]. Have you ever been to the outside of this residence?
> A. I -- you know, my attorney gave me the address so I could go, actually look at the place, I have definitely -- and *I have definitely been by it.*
> Q. *You have been by it?*
> A. *Yes.*

(Emphasis supplied.)

However, when the above testimony by Brooks from Quinn's trial was then read into the record in this case, a misreading occurred as follows:

> Q [by Quinn's defense counsel]. Have you ever been inside the [Arapahoe house]?
> A. Not that I recall, no.
> . . . .
> Q. Have you ever been to the outside of this residence?
> A. I -- you know, my attorney gave me the address so I could go, actually look at the place, I have definitely -- and *I have definitely been in it.*
> (*Reading of excerpt paused.*)
> [State]: *I'm sorry, can you repeat that.*
> MR. SEXTON: *I've been by it, I'm sorry.*
> (*Resumed reading of the excerpt.*)
> Q. *You have been by it?*
> A. *Yes.*
> Q. Okay. Did you stop by and get out of your truck?
> A. I don't recall ever stopping there.

Q. Okay. Is it possible that you stopped by there to give William Quinn at [sic] tool?

A. It could. He -- he -- about that time frame, he borrowed some PVC glue and whatnot. So it could be, but I don't recall it.

(Emphasis supplied.)

Exhibit 24 did not go back to the jury during deliberations.

Brooks argues that at the Quinn trial he "clearly denied being inside the residence at any point, and clearly admitted going by the residence at some point," but when this section was read into evidence in the current case, "Sexton misread a key portion of [Brooks'] testimony." Brief for appellant at 46. Sexton's reading "[made] it sound as if [Brooks] voluntarily admitted being inside the residence," "[t]hen, there was an awkward pause, seemingly with [Quinn's trial counsel] being surprised by the answer, which [trial counsel] asked [Brooks] to clarify," "[a]nd then, realizing his error, [Brooks] changed his story." *Id.* at 47. "Though received into evidence as Exhibit 24, the transcript of [Brooks'] testimony in the Quinn trial was not provided to the jurors for review during deliberations," "[s]o from the jurors' perspective, the exchange which took place did not do anything to clarify that Investigator Sexton misread [Brooks'] answer"; "[t]his was a blatant mischaracterization of [Brooks'] prior testimony, and an improper admission of prejudicial evidence against [Brooks]." *Id.* Brooks contends his trial counsel was ineffective because counsel failed to object to the mischaracterization and did not request that the district court admonish the jury that Brooks' testimony was not accurately read.

Brooks would not be able to establish prejudice by trial counsel's failure to object to the misreading of his previous testimony or by trial counsel's failure to request that the district court admonish the jury regarding the same. Brooks was first asked if he had ever been "inside" the Arapahoe house, and he said, "No." He was then asked whether he had ever been "outside" the house; it was his response to this question that was initially misread. In a follow-up question, Brooks was asked if he had been "by" the house, and he responded, "Yes." He was then asked if he stopped by and got out of his truck, and he responded, "I don't recall ever stopping there." Contrary to Brooks' assertion otherwise, based on the sequence of questions and answers, it is unlikely that the jury was left "with a view . . . that [Brooks] was shifty." *Id.* at 48. Even if the misreading of the answer by Sexton was attributed to a change in testimony by Brooks, such was not sufficient to undermine confidence in the outcome of Brooks' trial. Because Brooks could not show prejudice, this claim of ineffective assistance of trial counsel fails.

### (d) Exhibit 22

Brooks claims that his trial counsel was ineffective "for failing to object to exhibit 22, and for failing to call the owner of the vehicle in exhibit 22 to testify." Brief for appellant at 7-8.

At trial, C.G. testified about the events leading up to her sexual encounter with Brooks at the Arapahoe house. She said that she and Quinn were at the house, Quinn saw Brooks drive by and then Quinn made a phone call. "[A]bout five to ten minutes later, I looked out one of the bedroom windows and I seen [sic] a white truck parked in the yard. And then right after that, . . . Brooks came inside the house into the kitchen." Brooks subsequently had sex with her in the basement of the house.

With respect to her examination of Brooks' cell phone, Oliver testified she was asked to "locate any images . . . of a white pickup" because "that's what [Brooks] was driving on a certain date, and that would be relevant to this crime." Before looking for any images, Oliver "ran vehicle registration information for . . . Brooks to see what type of vehicles were registered to his name," and those records revealed that a white pickup truck was registered to him in September 2019. Oliver said that exhibit 22 was "an image of the white pickup that [she] located [on Brooks' phone] that had matched the description of the pickup that was registered to . . . Brooks." (Exhibit 22 is a picture of a white 4-door "F-150" pickup.) Later, the female homeowner of the Arapahoe house testified that one day towards the end of September (she could not remember the exact date) she saw Brooks sitting in his pickup talking to the Quinn. She said that the vehicle in exhibit 22 "looks to me like the vehicle that [Brooks] was sitting in, in my yard." However, Brooks' wife testified that Brooks never owned a white 4-door F-150, and that exhibit 71 was a picture of their pickup. (Exhibit 71 is a picture of a white 2-door F-150.)

Brooks argues that "[w]hite trucks are not unique," and "[n]o foundation was laid to support the claim that the truck in Exhibit 22 belonged to [him], or that it had any other relevance to the case." Brief for appellant at 49. "Clearly, [the State] wanted the jury to infer [Brooks] had a photo of his truck on his phone, and it was the same truck in which [the female homeowner] observed [Brooks] sitting." *Id.* at 48. Brooks also contends that before trial, he told trial counsel that the truck shown in exhibit 22 belonged to his friend or his friend's employer, and that trial counsel did not call the owner of the vehicle to testify about who owned the truck.

Even if the white truck pictured in exhibit 22 was owned by someone other than Brooks and/or was not the truck that the female homeowner saw Brooks sitting in on some unspecified date towards the end of September, such facts would not have been sufficient to undermine confidence in the outcome of Brooks' trial given the other evidence about Brooks being at the Arapahoe house. Because Brooks would not be able to show prejudice related to the admission of exhibit 22, this claim of ineffective assistance of trial counsel fails.

## VI. CONCLUSION

For the reasons stated above we affirm Brooks' conviction for first degree sexual assault of a child, C.G. Further, all claims of ineffective assistance of trial counsel raised by Brooks on direct appeal fail.

AFFIRMED.